**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 15 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

RAYMOND JOHNSON,

Defendant-Appellee.

No. 03-2153

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO
### (D.C. NO. CR-02-2038-MV)

Laura Fashing, Assistant U.S. Attorney (David C. Iglesias, U.S. Attorney, with her on the brief) Albuquerque, New Mexico, for Plaintiff-Appellant.

Richard Winterbottom, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellee.

Before **TYMKOVICH** and **McWILLIAMS** , Circuit Judges, and **PAYNE** ,[*] Chief District Judge.

**TYMKOVICH** , Circuit Judge.

---

[*] James H. Payne, Chief District Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

The United States appeals from a district court order granting defendant Raymond Johnson's motion to suppress a pistol seized from him by an Albuquerque police officer. We exercise jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291, reverse the district court's order, and remand for further proceedings.

Background

On October 24, 2002, Albuquerque Police ("APD") received a call from a citizen saying he had just seen a middle-aged man forcing a pre-teen girl to walk down Copper and Pennsylvania Avenues in a part of town known to police as the "War Zone" for its high levels of violent crime. The caller said he was still observing the pair and described their actions and appearance in detail, noting that the man appeared to be pushing and yelling at the girl and looking around for something, but that he did not see any weapons. The caller promptly gave police his cell phone number when asked and forthrightly answered all of the dispatcher's questions. He stayed on the line for approximately eight minutes, until he saw a marked police cruiser approach the pair.

The cruiser belonged to Officer Robert Middleton, who had heard the dispatcher's report of the incident on his police radio. The dispatcher had requested that officers investigate a suspicious person, and classified the call as Priority 2. Priority 2 calls are the second-highest category in the APD's priority

-2-

system, below emergencies requiring immediate response but above those which can wait for an hour or more. The dispatcher described a black male adult forcing a white female juvenile to walk southbound on Pennsylvania and described the man as approximately 35 years old, five feet, nine inches tall, with short, curly hair, wearing green jeans and a white jacket with red "USA" lettering. The dispatcher described the girl as around 12 years old, wearing a green hooded jacket and blue jeans, approximately 90 pounds, and the same height as the man. The dispatch information, which was also displayed on a computer screen in Officer Middleton's vehicle, indicated that it was unknown whether the man was intoxicated or armed.

Minutes after receiving the call, Officer Middleton drove down Pennsylvania Avenue and saw a man and girl matching the descriptions given by the caller and relayed by the dispatcher. The only difference in their appearance was the girl's height, which the caller had estimated as five feet, four inches, but which the dispatcher mistakenly had listed as five feet, nine inches. Officer Middleton briefly watched the pair and testified that he did not observe the man push or otherwise threaten the girl. He then pulled his marked cruiser next to the

pair, got out and identified himself. The man was later identified as the defendant and the girl as Samantha D.[1]

Officer Middleton told the pair about the call and asked if the girl was "okay." Samantha said she was, and both she and Johnson denied that anything untoward had happened. Officer Middleton testified that the girl did not appear injured or upset. According to Officer Middleton, however, Johnson was acting "fidgety" and looking back and forth. Johnson was also repeatedly pressing the transmission button on a walkie-talkie he was carrying, though he did not put it to his mouth and speak directly into it.

Just after Officer Middleton approached the pair, another officer, Rob Duren, arrived. Officer Middleton asked Officer Duren to question the girl while he talked to Johnson separately. Johnson and Officer Middleton then walked a few steps to the front of Officer Middleton's car, and Officer Middleton asked Johnson to put down the walkie-talkie. Johnson did so.

Officer Middleton testified that he was concerned that Johnson may have kidnapped the girl, or that the two were involved in prostitution. Officer

---

[1] Though the girl later testified that she initially gave a false name because she had run away from foster care in Ohio, we will follow the district court's lead and identify her herein as "Samantha" for purposes of consistency. Neither Samantha nor Johnson immediately told Officer Middleton what their relationship was, but later testimony revealed that Johnson was a friend of Samantha's mother, with whom Samantha was staying in Albuquerque.

Middleton knew that prostitution and drug dealing were prevalent in the "War Zone," and that drug dealers and other criminals often used walkie-talkies to signal each other to police presence or possibly to call in attackers. Officer Middleton himself had previously been involved in a shooting in the area.

Once they were alone, Officer Middleton asked to see Johnson's identification. Johnson handed over an ID card or his wallet, which the officer either put on the hood of his car or held in his hand. Officer Middleton then said, "I'm going to pat you down for weapons." Johnson immediately told the officer that he had a gun and gestured to his right side. Officer Middleton told Johnson to turn away from him, pulled Johnson's jacket aside, and retrieved a .22 caliber pistol from Johnson's belt. Officer Middleton then handcuffed Johnson.

Officer Middleton testified that Johnson was compliant, never made any threatening movements or remarks, and indeed acted "like a gentleman" during the three minutes between their initial meeting and the discovery of the weapon.

On November 15, 2002, a federal grand jury indicted Johnson on the sole count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In response, Johnson filed a motion to suppress the pistol. After conducting an evidentiary hearing, the district court granted Johnson's motion. This appeal followed.

Discussion

In its order, the district court gave three reasons for suppressing the weapon: (1) the anonymous call to police "was insufficient to provide reasonable suspicion for the initial stop," (2) even if the initial stop was permissible any "reasonable suspicion was dispelled by Officer Middleton's initial contact with Defendant and Samantha," and (3) "the pat-down search . . . was not based on a reasonable suspicion that Defendant was armed and dangerous, and was conducted after any possible reasonable suspicion of criminal activity had been dispelled." On appeal, we view the evidence in the light most favorable to the prevailing party and review the district court's findings of fact only for clear error. *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277-78 (10th Cir. 1998). The ultimate question of the reasonableness of the seizure of the pistol is a legal question we review de novo. *Id.* at 1277.

I.

As we have recognized before, police-citizen encounters come in three varieties.

> The first involves the voluntary cooperation of a citizen in response
> to non-coercive questioning. The second is a *Terry v. Ohio*, 392 U.S.
> 1 (1968), stop, involving only a brief, non-intrusive detention and
> frisk for weapons when officers have a reasonable suspicion that the
> defendant has committed a crime or is about to do so. The third
> encounter is the arrest of the defendant.

*United States v. Madrid*, 30 F.3d 1269, 1275 (10th Cir. 1994).

-6-

"The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). Police officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures. *See id*. at 434-35. The parties here agree that Johnson's interaction with Officer Middleton began as a voluntary, non-coercive conversation that evolved into an investigatory detention and search for weapons that falls within *Madrid*'s second category. They agree the district court erred when it stated that Officer Middleton needed "a particularized, articulable and reasonable suspicion that Defendant was engaged in criminal activity" before initially stopping and questioning Johnson and Samantha.

The parties disagree about precisely when Johnson's participation became involuntary, thus implicating the Fourth Amendment. Though it is debatable whether the relevant aspects of the encounter ever moved beyond voluntary cooperation, the government has conceded that a seizure occurred when Officer Middleton took Johnson's identification. Johnson claims it was a few moments earlier, when Officer Middleton asked him to put down the walkie-talkie. Because we conclude Officer Middleton had reasonable suspicion both when he asked Johnson to put down the walkie-talkie and when he asked for Johnson's identification, we need not determine the precise moment when a seizure occurred

and will assume, without deciding, that the "inception of the detention" coincided with Officer Middleton's request that Johnson put down the walkie-talkie.

For our purposes, then, we simply note that after separating Johnson and Samantha, Officer Middleton did four things in rapid succession: First he asked Johnson to put down the walkie-talkie. Next, he took Johnson's identification. Then he told Johnson he was going to pat him down for weapons. Finally, after Johnson said he was carrying a gun, Officer Middleton reached under Johnson's jacket and removed the pistol. These actions, taken together, constitute the detention and weapons search whose reasonableness we must decide.

## II.

*Terry* sets up a two-prong test of the reasonableness of investigatory detentions and weapons searches. *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997). First, we must decide whether the detention was "'justified at its inception.'" *Id.* (quoting *Terry*, 392 U.S. at 20). The government "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry*, 392 U.S. at 21. Those facts must tend to show that the detainee has committed or is about to commit a crime. *Gallegos*, 114 F.3d at 1028 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1993)). Second, the officer's actions must be "'reasonably related in scope to the circumstances which justified

the interference in the first place.'" *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) (quoting *Terry*, 392 U.S. at 20). At both stages, the reasonableness of the officer's suspicions is "judged by an objective standard taking the totality of the circumstances and information available to the officers into account." *United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996).

## A.

We agree with the government that the district court's order impermissibly "evaluate[d] and reject[ed] each factor in isolation" and failed to accord proper deference to the judgment of an experienced officer. *See United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003). The district court proceeded through the factors listed by the government, but evaluated and rejected each before moving on to the next. The court's order mentions the appropriate "totality of the circumstances" standard only once, in passing, and only after having analyzed each factor cited by Officer Middleton in isolation. Our de novo review of those factors leads us to conclude that the totality of the circumstances Officer Middleton faced made his suspicions and actions reasonable.

## 1. The Tip

The district court first addressed whether the anonymous call alone was sufficient to give Officer Middleton reasonable suspicion. The court relied

heavily on *Florida v. J.L.*, 529 U.S. 266 (2000), in deciding it was not. In *J.L.*, an anonymous caller told police that a young black male wearing a plaid shirt at a particular bus stop was carrying a gun. Officers responded to the bus stop, where they found three young black men, including J.L., who was wearing a plaid shirt. They frisked J.L. and found a gun. The Supreme Court pointed out that "apart from the tip, the officers had no reason to suspect any of the three of illegal conduct." *Id.* at 268. The Court then held that even though J.L. matched the tip's physical description, without any other evidence of criminal conduct the tip did not have sufficient "indicia of reliability" to give rise to reasonable suspicion. *Id.* at 271-72 (citing *Alabama v. White*, 496 U.S. 325 (1990)).

The purpose of the Fourth Amendment and the associated exclusionary rule is not to grant certain guilty defendants a windfall by letting them go free -- though it sometimes does do that. *See Elkins v. United States*, 364 U.S. 206, 217 (1960) (quoting then-Judge Cardozo in *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926): "The criminal is to go free because the constable has blundered."). The objective is rather to protect *all* citizens, particularly the innocent, by deterring overzealous police behavior. *See Mapp v. Ohio*, 367 U.S. 643, 656 (1961) ("[T]he purpose of the exclusionary rule 'is to deter . . . .'") (quoting *Elkins*, 364 U.S. at 217); *Arizona v. Evans*, 514 U.S. 1, 10 (1995) ("The exclusionary rule operates as a judicially created remedy designed to safeguard against future

violations of Fourth Amendment rights through the rule's general deterrent effect."). *See also* Potter Stewart, *The Road to* Mapp v. Ohio *and Beyond*, 83 Colum. L. Rev. 1365, 1368 (1983) (arguing that the exclusionary rule is needed to reduce "frequent infringements motivated by commendable zeal, not condemnable malice").[2]

With that in mind, we can better understand why anonymous tips trouble the courts and sometimes lead to the suppression of otherwise reliable evidence. The first concern relates to the motives of the tipster. A tipster who refuses to identify himself may simply be making up the story, perhaps trying to use the police to harass another citizen. This is why the Supreme Court, in *White* and *J.L.,* has required that anonymous tips be accompanied by corroboration and "other indicia of reliability." *See J.L.* 529 U.S. at 271-72 (citing *White*, 496 U.S. 325 (1990)).

A second concern relates not to a tip's anonymity but to its level of specificity. Overly generic tips, even if made in good faith, could give police

---

[2] Whether other remedies might better serve that purpose has provided the basis for much academic debate. *See, e.g.*, Akhil Reed Amar, *Against Exclusion (Except to Protect Truth or Prevent Privacy Violations)*, 20 Harv. J.L. & Pub. Pol'y 457, 464 (1997) ("[T]he distribution of benefits under the exclusionary rule is 'upside down,' helping the guilty, not the innocent."); William J. Stuntz, *The Virtues and Vices of the Exclusionary Rule*, 20 Harv. J.L. & Pub. Pol'y 443 (1997); Yale Kamisar, *In Defense of the Search and Seizure Exclusionary Rule*, 26 Harv. J.L. & Pub. Pol'y 119 (2003), and sources discussed therein at n.1.

excessive discretion to stop and search large numbers of citizens. This too was underlying the *J.L.* decision, where the Court emphasized the lack of detail in the tip, which only pointed to a young black man wearing a plaid shirt at a certain bus stop. *See* 529 U.S. at 272. Such a tip could, obviously, give police an excuse to stop and search a large number of young men. The Court's insistence on additional detail from the tipster and corroborating observation by the police helps ensure that police do not use vague tips to violate the Fourth Amendment rights of innocent citizens. *See White*, 496 U.S. at 330 ("[I]f a tip has a low degree of reliability, more information will be required to establish the required quantum of suspicion than would be required if the tip were more reliable.").

Though we are mindful of the concerns expressed in *J.L.*, they are mitigated by other facts here. First, although the dispatcher did not ask the caller's name or address, he did give police his cell phone number. *See United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002) (ability of police to determine tipster's identity "provides a disincentive for making false allegations," which courts should take into account). He also stayed on the line for approximately eight minutes describing what he was seeing, and his descriptions of Johnson's and Samantha's appearance and location, if not the threatening behavior, were confirmed by Officer Middleton's observations. *See id.* at 554-55 (firsthand knowledge entitles the tip to greater weight); *United States v. Tuter*, 240 F.3d

1292, 1297-98 (10th Cir. 2001) (substantiated firsthand observations can support a finding of reliability). These facts diminish the likelihood that the caller was fabricating his story. Secondly, the description's considerable detail significantly circumscribed the number of people police could have stopped in reliance on it.[3]

Because the initial stop and conversation between Johnson and Officer Middleton was consensual, however, we need not decide whether the tip alone was sufficient under *White* and *J.L.* to provide reasonable suspicion for a search. We simply hold that the tip and the accompanying information relayed to Officer Middleton, which included the dispatch's priority level and a description of the people and situation, are sufficiently reliable to be analyzed as part of the totality of the circumstances.

## 2. The Initial Conversation

The district court, "assuming *arguendo* that the anonymous tip provided reasonable suspicion justifying the initial stop" ruled that any such reasonable suspicion "was dispelled after Officer Middleton's initial contact" with them. Again, perhaps because the district court was incorrect in its determination of when reasonable suspicion was necessary to justify Officer Middleton's actions,

---

[3] Indeed, it seems unlikely that the tip would have given police a reason to stop any other couple in the state of New Mexico, let alone on a particular street in a high crime neighborhood in Albuquerque.

its analysis of this issue fails to account for the totality of the circumstances standard.

It is true that Officer Middleton's initial observation and conversation with the pair called into question much of the information in the tip. They both denied that Johnson had been forcing Samantha to do anything, and Samantha's appearance did not belie their claims. Johnson's gentlemanly, if nervous, behavior likewise gave credence to their denials.

This does not mean, however, that Officer Middleton should have simply abandoned his investigation at this point, blithely sending the couple on their way in Albuquerque's most dangerous neighborhood. The Fourth Amendment does not require police to be so credulous. As Officer Middleton pointed out, in a kidnapping, domestic violence, or similar situation, Samantha would likely be intimidated when answering in front of Johnson, and both would have had an incentive to lie if they were involved in some other criminal activity such as prostitution or drug dealing. It is not an unreasonable inference that even before Officer Middleton pulled over in a marked police cruiser, the two knew an officer was watching them and behaved accordingly.

### 3. Johnson's Nervousness

The district court next found that Johnson's fidgeting and looking about was "entirely normal" and therefore not a pertinent factor in the reasonable

suspicion analysis. The government disputes both the characterization of Johnson's behavior and the decision not to consider it.

The first of these decisions by the district court – that Johnson's behavior was not outside the range of normal reactions to police questioning – is a finding of fact, which we review only for clear error. *See Gandara-Salinas*, 327 F.3d at 1129. The record indicates that Johnson was "acting fidgety," that he continuously glanced around, and that he repeatedly depressed the transmission button on his walkie-talkie. But as the district court noted, we have recognized that even innocent people can display some nervousness when being questioned by police. *See United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998). Though Johnson's nervous behavior might suggest he had something to hide, we cannot say the district court committed clear error in characterizing it as within the range of behavior that an innocent person might exhibit under similar circumstances.

The district court's decision that this means Johnson's behavior was not part of the totality of the circumstances, however, is an incorrect application of the law. We have held that typical "nervousness alone cannot support reasonable suspicion of criminal activity," and "is of limited significance," and that courts should "discount the detaining officer's reliance on the detainee's nervousness." *Id.* (internal quotations and citations omitted). Conduct that may be wholly

innocent may nonetheless support a finding of reasonable suspicion in certain circumstances. *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989). For that reason, we have also made clear that nervousness, even if it may be a normal reaction, is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded. *See United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1998); *United States v. Williams*, 271 F.3d 1262, 1268-69 (10th Cir. 2001). "Discounting" something is not the same as "disregarding" it, as bargain-hunters responding to advertisements for "discounted prices" will discover. The district court therefore erred in not including Johnson's behavior in the totality of the circumstances.

## 4. The Walkie-Talkie

After having rejected the tip and Johnson's behavior, the district court went on to dismiss Johnson's "handling of the walkie-talkie [as] a contributing factor to the reasonable suspicion determination." Officer Middleton testified that Johnson's handling of the walkie-talkie made him suspicious because walkie-talkies are often used by people involved in drug dealing and other crime, and that by depressing the button Johnson could be signaling to someone that he was being confronted by police. The court refused to consider this because Officer

Middleton acknowledged that Johnson never spoke directly into the walkie-talkie and that he was not sure Johnson was actually calling someone.

The district court's ruling on this point is directly contradicted by our holding in *Williams*, where we acknowledged that police have learned that such devices are often used by drug traffickers and that they suggest the close proximity of a coconspirator. *See* 271 F.3d at 1269. *See also United States v. Inocencio*, 40 F.3d 716, 723 n.9 (5th Cir. 1994) (describing use of walkie-talkies by drug smugglers). An officer need not actually observe an individual use an object in a criminal manner for it to raise the officer's suspicions. *See Sokolow*, 490 U.S. at 9-10. Indeed, in *Williams*, the officer never even saw the defendant touch the walkie-talkie; he just saw it on the passenger seat of the defendant's vehicle. 271 F.3d at 1265. Although in some situations a walkie-talkie may be innocuous, here, as in *Williams*, "the radio in this case contributed substantially to the officer's suspicion that criminal activity was afoot." 271 F.3d at 1269. In Officer Middleton's words, a walkie-talkie "really gives us that heightened sense of awareness . . . . [W]e get really concerned as to who is watching us and who is listening to what's going on and who is going to be coming in to see us." The fact that Johnson appeared to be using this device to broadcast his dialogue with Officer Middleton only added to the aura of illegality and danger.

-17-

## 5.  The "War Zone"

The only factor the district court found relevant to the reasonable suspicion analysis was the dangerousness of the area in which the stop took place.  Quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), the district court correctly acknowledged that the nature of the area in which a detention takes place is a relevant consideration in the *Terry* analysis.  The court went on, however, to find the following statement in *Wardlow* controlling: "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."  528 U.S. at 124.  Given our discussion above of the numerous factors erroneously rejected by the district court, this latter statement obviously does not apply in this case.[4]

## 6.  The Totality of the Circumstances

In ignoring these reasons for Officer Middleton's continuing suspicion, the district court "failed to accord deference to the [officer's] ability to 'draw on (his) own experience and specialized training to make inferences from and deductions about the cumulative information available to (him) that might well elude an untrained person.'"  *Gandara-Salinas*, 327 F.3d at 1130 (quoting *United States v.*

_____

[4] Nor did it in *Wardlow* itself, where the Court upheld the detention of a suspect who had attempted to flee from police in a dangerous area.  528 U.S. at 124-25.

*Arvizu*, 534 U.S. 266, 273 (2002)).  All of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by Officer Middleton at the inception of the detention.

When we apply the proper legal analysis to the fact findings of the district court, then, the record shows that the following circumstances faced Officer Middleton at the time of the detention: (1) the police had received a call from a citizen who gave his phone number (but not his name) and described an adult male forcing a juvenile girl down the street; (2) the caller gave a detailed and accurate description of Johnson's and Samantha's appearance and where officers would find them; (3) the caller did not know if the man was armed; (4) the dispatcher requested that officers check on a suspicious person and attached the department's second-highest priority to it; (5) Officer Middleton's brief observation did not suggest that Johnson was using force on Samantha; (6) Samantha and Johnson both denied the caller's allegations when first questioned; (7) drug dealers, pimps, and kidnappers are often armed; (8) Johnson was nervous, if not abnormally so, but also cooperative and polite; (9) Johnson was depressing the transmission button on a walkie-talkie; (10) individuals involved in criminal activity often use walkie-talkies to communicate with each other; (11) the incident took place in Albuquerque's highest-crime area.

Though we agree with Johnson that under these circumstances a reasonable person might have some doubts about the accuracy of the tipster and about Johnson's actual involvement in criminal activity, we do not agree that such doubts made Officer Middleton's actions unreasonable. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Indeed, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274. Furthermore,

> [r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Tuter,* 240 F.3d at 1296 n.2 (citing *White*, 496 U.S. at 330). Thus, as long as he has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality.

Under the specific facts of this case, Officer Middleton had a reasonable suspicion that Johnson might be involved in one or more criminal activities, including drug dealing, kidnapping, or prostitution. His suspicions were particularized to Johnson, and were based on how his training and experience

-20-

taught him to interpret a number of objectively reasonable details. This is more than the "inchoate and unparticularized suspicion or 'hunch'" warned against in *Terry*. *See* 392 U.S. at 27. We cannot say it was unreasonable, therefore, for Officer Middleton to suspect that criminal activity was afoot. *See id.*

B.

To satisfy *Terry*'s second prong Officer Middleton's actions must also have been "reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20. During the detention Officer Middleton took Johnson's identification, told Johnson that he was going to pat him down, and retrieved the gun from where Johnson indicated it was.

An officer may take reasonable precautions to protect his safety during an investigative detention. *See Shareef*, 100 F.3d at 1502. Because Officer Middleton reasonably suspected that Johnson might be involved in drug dealing, kidnapping, or prostitution, these actions did not exceed the scope of his suspicions. The crimes about which Officer Middleton was concerned are typically associated with some sort of weapon, often guns. Officer Middleton "confined his search strictly to what was minimally necessary" to ensure Johnson was not armed, simply telling Johnson he was going to pat him down. *See Terry*, 392 U.S. at 29-30. He did not threaten Johnson in any way, use force, or handcuff him. Indeed, once Johnson told him where the gun was, Officer

-21-

Middleton did no more than was required to retrieve the gun. These actions were permissible under *Terry*. *See id.* at 29-30 ("[The officer] confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find.").

## Conclusion

The district court's findings of fact are not clearly erroneous. Our de novo review of the legal conclusions to be drawn from those facts, however, shows that the district court erred in granting Johnson's motion to suppress because Officer Middleton's actions were objectively reasonable.

This is a close case. A reasonable officer in Officer Middleton's shoes may have thought Johnson was in fact not involved in criminal activity. But every indication is that Officer Middleton acted just as society would want its law enforcement officers to act when investigating a suspicious situation.[5] He was aware of a number of facts that made him suspect that Johnson might be involved in potentially dangerous criminal activity. He did not threaten or intimidate Johnson, or do any more than was necessary to negate or, as it turned out, confirm his suspicions. He took modest steps to protect his and the public's safety.

---

[5] Mr. Johnson, by all accounts, also should be commended for his "gentlemanly," honest, and civil behavior toward Officer Middleton. Unfortunately for all involved, before encountering Officer Middleton, he decided to break a federal law by carrying a weapon.

[W]here the officer's conduct is objectively reasonable, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty."

*United States v. Leon*, 468 U.S. 897, 919-920 (1984) (quoting *Stone v. Powell*, 428 U.S. 465, 539-40 (1976) (White, J., dissenting)). In this case, excluding the weapon Officer Middleton took from Johnson would not deter any misbehavior and would only make police officers less willing to do their duties.

The decision of the district court is therefore REVERSED and the case is REMANDED for further proceedings consistent with this opinion.