**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CHAPEN D. PEEK,

Defendant - Appellant.

No. 05-1414

(D. Colorado)

(D.C. No. 04-CR-494-B)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

Chapen D. Peek pled guilty to possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1), and was sentenced to seventy months' imprisonment, followed by three years of supervised release. In his plea agreement, he reserved his right to appeal the district court's denial of his motion to suppress, and he now brings that appeal. For the reasons set forth below, we affirm.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## BACKGROUND

The search that Peek challenged in his motion to suppress took place in the basement bedroom of Tina Arellano, a participant in Colorado's intensive supervision program, which allows certain offenders serving a sentence following a state conviction to serve their time in the community while wearing an ankle bracelet, subject to supervision by the Parole Division of the Colorado Department of Corrections. At the time, Arellano, who was serving a sentence for a drug offense, was residing at the home of her stepfather, Adlido Gurule.

On November 18, 2004, Gurule went to the parole office and spoke with Officer Barbara Clementi, the parole officer assigned to supervise Arellano, and Officer Clementi's supervisor, Officer Phillip Aragon. According to Officer Aragon's later testimony, Gurule "indicated that Ms. Arellano was using drugs, and there were a lot of . . . shady characters hanging around the house. He believed that they were trafficking narcotics out of his home . . . ." Tr. of Mot. to Suppress Hr'g at 10, R. Vol. II. Officer Clementi testified that Gurule "stated that he was just fed up with what was going on at his residence, that he believed his . . . stepdaughter w[as] involved in drugs, using and trafficking, and there was a lot of traffic in his residence." Id. at 59. Gurule indicated that he wanted to stop the activities that he suspected were occurring in his home but did not want others to know of his involvement, and therefore told Officer Clementi "that he

would give [her] a 911 page if there was anybody that he thought was coming in his residence selling drugs." Id. at 61.

Officer Clementi testified that, based on what Gurule said and on her observation, during Arellano's last visit to her office one or two days previously, of fresh track marks on Arellano's arm and sores on her face, she suspected Arellano was using drugs in violation of the conditions of her supervision. Officer Clementi therefore planned to go to Arellano's house to conduct an on-site urinalysis drug test. That evening, she and Officer Aragon were already driving towards Arellano's residence when they received a 911 page from Gurule.

According to Officer Clementi, when the officers arrived at the house and rang the doorbell, Gurule let them inside, saying "Come on in, go downstairs, they're at it again." Id. at 64. Officer Aragon testified that Gurule said "They're downstairs" and "They're at it right now." Id. at 14. Gurule then showed them the stairs leading to the basement, and the officers went downstairs and down the hall to the bedroom, the door of which was half closed. Officer Clementi testified that she pushed the door open and saw Arellano sitting in a chair to the right and a man, later identified as Peek, sitting on a bed to the left, leaning against the wall, and wearing a jacket. The room was cluttered with furniture, clothing, and CD equipment, among other things. Neither officer saw any drugs or drug paraphernalia in plain view.

-3-

According to the parole officers, Officer Clementi then asked Peek what his name was, and Peek answered that his name was "Frank." Officer Aragon had been Peek's parole officer in 1996 and testified that, after hearing Peek speak, he recognized Peek and told him "That's not your name, your name is Chapen Peek." Id. at 21. According to Peek, this exchange did not take place.

Officer Aragon then asked for Peek's driver's license and told him he was going to run a warrants check. According to Officer Aragon, at this point Peek became "very nervous," with sweat "dripping down along the side of his face." Id. at 22. The warrants check produced no indication of any outstanding warrants. Officer Aragon then told Peek that he was going to conduct a pat-down search of his person for officer safety. Officer Aragon testified that he believed Peek might have a weapon because of Peek's nervousness and because, on a previous occasion in June 2004, he had found a knife in the possession of Arellano and was aware that Arellano "was involved in a lot of narcotics transaction." Id. at 26. According to Officer Aragon, in his experience "a lot of times narcotics and firearms are synonymous." Id.

The officers testified that when Officer Aragon told Peek he was going to conduct a pat-down search, Peek exclaimed "no!" Id. at 24. Officer Aragon then asked Peek if he had a weapon, and Peek first responded negatively, then stated that he did have a weapon. The officers then drew their weapons, told Peek to

place his hands on top of his head, "opened [Peek's] jacket and saw a black shoulder holster with a stainless revolver inside" it. Id. at 25.

Peek was placed under arrest and indicted on one count of violating 18 U.S.C. § 922(g)(1), based on his possession of the firearm after a prior state conviction for attempted escape. He filed a motion to suppress the firearm as evidence, arguing that the officers detained and searched him in violation of the Fourth Amendment. Following a hearing, the district court held that the officers' initial detention of Peek was valid based on the officers' reasonable suspicion that Peek was involved in criminal activity. Assessing the factual dispute between Peek and the officers over whether Peek had actually given a false name when the officers first entered Arellano's room, the court stated that it had "no reason to question the parole officers' credibility." Order at 7, R. Vol. I, doc. 23. However, the court stated that its determination of whether the officers had reasonable suspicion that Peek was armed and dangerous "does not hinge on whether [Peek] lied about his name" but instead required reference to "other specific facts." Id. at 8. The court explained its conclusion that there was reasonable suspicion justifying a pat-down search as follows:

> It is uncontested that both officers are experienced in the tactics and circumstances of narcotics use and trafficking. And it is well known to both police and parole officers that weapons are frequently used to protect drug supplies. The officers confronted Arellano and [Peek] in Arellano's small, cluttered bedroom, a confined space, her "turf." The officers were dealing with suspected

narcotics users and/or traffickers, each of whom was either [under intensive supervision] or had been on parole.

Officer Aragon found an illegal knife on Arellano's person a few months before the bedroom encounter. The officers had reasonable suspicion that she might be armed. [Peek] contends that during his parole, he was cooperative, never armed, and never considered a threat. While those facts were verified by Officer Aragon during his testimony, they carry little weight under the circumstances.

The officers were there under their authority to obtain a urine sample from Arellano. In the confined space of the basement bedroom with one exit, [Peek] was obviously nervous. He was sweating and fidgeting. He was involved with a known drug user and drug seller who had an illegal weapon in the past. And he probably lied about his name. I conclude that given the totality of the circumstances, both officers had more than sufficient reasonable, articulable suspicion to believe that [Peek] might be armed and dangerous.

Id. at 9. The court thus denied Peek's motion to suppress. As indicated above, Peek entered a conditional guilty plea and appealed the district court's denial of his motion.

## DISCUSSION

When reviewing the district court's denial of a motion to suppress evidence, "'we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth

Amendment.'" United States v. Apperson, 441 F.3d 1162, 1184 (10th Cir. 2006) (quoting United States v. Katoa, 329 F.3d 1203, 1205 (10th Cir. 2004)).

The district court analyzed the events leading up to the parole officers' discovery of Peek's firearm using the framework set forth for investigative detentions by police officers in Terry v. Ohio, 392 U.S. 1 (1968). Neither party contests Terry's applicability, and we agree it applies here.[1] Under Terry, "[a] lawful investigative detention of limited scope and duration does not require probable cause as long as the police officer has reasonable suspicion that the person seized is engaged in criminal activity." United States v. Dennison, 410 F.3d 1203, 1207 (10th Cir.) (citing Terry, 392 U.S. at 30-31), cert. denied, 126 S. Ct. 468 (2005). During such a detention, the officer "may also conduct a protective frisk of the suspect's outer clothing if he reasonably believes that the suspect might be armed and dangerous." United States v. Maddox, 388 F.3d 1356, 1361 (10th Cir. 2004) (citing Terry, 392 U.S. at 27, 30). Here, Peek argues that the parole officers lacked reasonable suspicion that he was involved in criminal activity when they initially detained him, and that the officers lacked a reasonable suspicion that he was armed and dangerous at the time Officer Aragon announced he was going to perform a pat-down search for weapons.

---

[1]It is undisputed that Colorado parole officers are peace officers under Colorado law, "whose authority shall include the enforcement of all laws of the state of Colorado," Colo. Rev. Stat. § 16-2.5-136, and who are subject to the same certification and training requirements as any police officer, id. § 16-2.5-102.

-7-

## I.    Initial Detention

Although the government and Peek disagree on whether Peek was "seized" for Fourth Amendment purposes at the moment the parole officers appeared at the doorway of Arellano's bedroom, the government does not dispute the district court's conclusion that, at the latest, Peek was seized at the point that Officer Aragon demanded his driver's license to run a warrants check.  We agree with the district court.  At that point, the two officers were blocking the entrance to Arellano's bedroom, and the circumstances, as described above, made it clear that Peek was not free to leave.  Compare United States v. Lopez, 443 F.3d 1280, 1286 (10th Cir. 2006) (holding the defendant was seized where circumstances and officers' behavior made clear that the defendant was not free to refuse to provide his driver's license or free to leave), with United States v. Esparza-Mendoza, 386 F.3d 953, 960 (10th Cir. 2004) (holding the defendant was not seized under the circumstances although police had requested his identification).

Peek argues that this seizure was unreasonable because the officers lacked any reasonable suspicion of wrongdoing particular to himself, rather than Arellano, when they arrived at Arellano's bedroom door.  He points out that "Gurule never mentioned [Peek] by name or physical description, nor did he allege having observed any specific illegal conduct by Mr. Peek," and contends that Gurule's reference to a "they" who were "at it again" downstairs was too

vague to provide a basis for reasonable suspicion that he was involved in any criminal activity. Appellant's Op. Br. at 12. We disagree.

As Peek concedes, the parole officers certainly had a reasonable suspicion, based on Officer Clementi's own observations and Gurule's statements, that Arellano was involved in drug-related criminal activity.[2] Gurule's page of Officer Clementi and Gurule's statements when the officers entered the house indicated that Arellano and whoever was with her downstairs were currently engaging in such activity. When the officers arrived at Arellano's room, the only person there other than Arellano was Peek. We have recognized that

"[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004) (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). It was not necessary that Gurule specifically give Peek's name or description in order for the officers to have reasonable suspicion that he was involved in whatever criminal activity might be afoot. Under the circumstances here, we hold that the parole officers were

---

[2]Of course, Arellano's own privacy interests were diminished since she was under the active supervision of the Colorado Parole Division. See Griffin v. Wisconsin, 483 U.S. 868, 873-74 (1987); United States v. Lewis, 71 F.3d 358, 361 (10th Cir. 1995).

justified in detaining Peek so that they might seek to confirm or dispel that suspicion.

## II.    Pat-Down Search for Weapons

Peek also argues that at the time Officer Aragon declared his intention to perform a pat-down search of Peek for weapons, the officers did not have a reasonable suspicion that he was armed and dangerous.  As indicated above, the district court held that a pat-down search was justified at that point based on (1) the parole officers' reasonable suspicion that Arellano and Peek were "narcotics users and/or traffickers," and the connection the officers drew, based on their experience, between drug trafficking and weapons, (2) Officer Aragon's previous experience "f[inding] an illegal knife on Arellano's person a few months before," (3) "the confined [and cluttered] space of the basement bedroom with one exit," (4) Peek's nervousness, including his excessive sweating, (5) Peek's "involve[ment] with" Arellano, "a known drug user and drug seller who had an illegal weapon in the past," (6) and the court's conclusion that, in accord with the officers' version of events, Peek "probably lied about his name."  Order at 9, R. Vol. I, doc. 23.

Peek contends that "[n]one of these reasons is sufficient," Appellant's Op. Br. at 16, and attempts to discredit each factor as a justification for believing Peek was armed and dangerous.  Specifically, Peek argues (1) that a suspect's

nervousness does not provide a proper basis for suspecting that he is armed, (2) that there is no reasonable connection between Arellano's prior possession of a knife and the suspicion that Peek might possess a weapon, (3) that the officers had no basis for suspecting Peek of drug trafficking, as opposed to drug use, and drug use alone is not associated with weapon possession, (4) that the district court's finding that Peek "probably" lied about his name is clearly erroneous because it would make no sense for Peek to lie about his name to Officer Aragon, his former parole officer, (5) that the heightened safety concerns that arise when officers are inside a home are insufficient to support a pat-down search.

However, in determining whether reasonable suspicion existed, we must take into account the totality of circumstances, "consider[ing] whether the facts as a whole 'amount to reasonable suspicion,'" even where "each separate fact or observation . . . 'is not by itself proof of any illegal conduct.'" Dennison, 410 F.3d at 1208 (quoting United States v. Sokolow, 490 U.S. 1, 8 (1989)). Thus, we have held that while "typical nervousness alone . . . is of limited significance," nervousness "is still among the pertinent factors a reasonable law enforcement officer would analyze . . . and should not be completely disregarded" when reviewing the totality of the circumstances. United States v. Johnson, 364 F.3d 1185, 1192 (10th Cir. 2004) (internal quotation omitted); see also United States v. Harris, 313 F.3d 1228, 1236 (10th Cir. 2002) (holding court "may take into account Defendant's nervous behavior in determining whether . . . [a] protective

frisk was justified"). Similarly, "the nature of the area in which a detention takes place is a relevant consideration." Johnson, 364 F.3d at 1193; see also United States v. Shareef, 100 F.3d 1491, 1506 (10th Cir. 1996) (taking into account the fact that the police officers had detained the suspects "in their cars, at night," and "could not tell whether the[y] had weapons on their persons or within reach," in upholding a Terry pat-down search).

Here, Peek not only appeared nervous but, according to the officers, was sweating profusely. The cluttered nature of Arellano's bedroom made it difficult for the officers to determine whether weapons might be hidden there. The fact that the officers were in Arellano's home territory, and the fact that the officers were standing in the doorway, thus blocking any means of escape, provided a context that reasonably raised the officers' safety concerns. Moreover, Peek was wearing a jacket, which could also easily conceal a weapon. All of these factors, while not dispositive by themselves, are relevant to the analysis.

In regard to Peek's challenge to the district court's finding that he "probably" lied about his name, we disagree that this finding is clearly erroneous. As the district court explained, it was conceivable that Peek might have lied to Officer Clementi, who entered Arellano's bedroom first, before noticing that her companion, Officer Aragon, was his former parole officer. This factual finding therefore remains relevant although it is clear that the district court did not place great weight on this factor in its "armed and dangerous" analysis.

-12-

Of greater significance is the point that the officers had a reasonable suspicion that either Arellano or Peek or both might be involved in trafficking drugs. United States v. Hishaw, 235 F.3d 565, 570 (10th Cir. 2000) (holding that a reasonable suspicion that the defendant "was distributing drugs . . . also indicated that he might be armed and dangerous" based on the connection between drug trafficking and weapons); see also United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999) (holding that indications that a suspect might be involved in drug trafficking "contributed to reasonable suspicion that [he] was armed and dangerous" because "[d]rug dealing is a crime infused with violence" (internal quotation omitted)); United States v. Woodall, 938 F.2d 834, 837 (8th Cir. 1991) (holding that police officer's recognition that an individual had recently been arrested for narcotics trafficking contributed to his reasonable suspicion that the individual was armed and dangerous). As indicated, Peek challenges the notion that there was any indication that he was involved in drug trafficking, and argues that to the extent a suspicion of drug use was justified, simple drug use is not associated with weapons in the way that drug trafficking is. See, e.g., United States v. Wald, 216 F.3d 1222, 1226-27 (10th Cir. 2000) (holding that a police officer who had initiated a traffic stop was not justified in conducting a pat-down search where he "suspected 'drug usage,'" smelled burnt methamphetamine, which is "indicative of drug usage, rather than drug trafficking," the defendants appeared nervous, and one had "bloodshot, glassy" eyes). At oral argument, Peek

-13-

emphasized that it is far likelier that the drug purchaser will visit the drug dealer to make a purchase rather than the other way around, suggesting that the officers should have assumed Peek to be the buyer in any drug transaction they suspected was occurring in Arellano's bedroom. Of course, Peek's suggested scenario does not take into account the fact that Arellano was under intensive supervision, which likely limited her freedom of movement outside her residence.

In any case, however, the officers in this situation were not required to limit their safety concerns to Arellano. It is true that an individual's "'mere propinquity to others'" reasonably believed to be armed and dangerous does not by itself justify a pat-down search of that individual. Dennison, 410 F.3d at 1211 (quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979)). However, unlike in Ybarra, where a search of an individual who had coincidentally been a customer in a public tavern during the execution of a search warrant was found unreasonable, 444 U.S. at 92-93, Peek's presence in Arellano's bedroom could not be construed as mere coincidence. Rather, it indicated a connection between the two, and Gurule's statement when the officers entered the house suggested that this connection involved illegal drug activity of some kind. Gurule's prior statements suggested that the activity might involve drug trafficking. Arellano's prior possession of a knife reinforced the suspicion that weapons might be present, possibly passed from Arellano to Peek if they heard the officers coming down the stairs.

-14-

Under these circumstances, viewing the evidence in the light most favorable to the government, an experienced officer, taking into account the totality of the circumstances, including the factors mentioned above, could reasonably suspect that Peek was armed and presently dangerous. See Dennison, 410 F.3d at 1213 (upholding a protective sweep of defendant's truck when passenger was reasonably considered armed and dangerous where there was reason to believe the defendant and the passenger were engaged in a common illegal enterprise); Shareef, 100 F.3d at 1506 (concluding police had a "reasonable belief that the defendants posed a danger" where police suspected one individual of being armed and dangerous, knew the other defendants were traveling with him, and had reasonable suspicion the other defendants were involved in criminal activity). We therefore uphold the district court's conclusion that Officer Aragon was justified in initiating the pat-down search, and affirm its denial of Peek's motion to suppress.[3]

---

[3]The government raises a number of alternative arguments in support of the district court's ruling. Because we uphold the ruling on the grounds set forth here, we need not address the government's additional arguments.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge