FILED
United States Court of Appeals
Tenth Circuit

**July 11, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

TOMMY GURULE,

Defendant-Appellee.

No. 18-4039

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## (D.C. NO. 2:17-CR-00485-DS-1)

---

Ryan D. Tenney, Assistant United States Attorney (John W. Huber, United States Attorney, with him on the briefs), Office of the United States Attorney, Salt Lake City, Utah, for Appellant.

Daphne Oberg, Assistant Federal Public Defender (Kathryn N. Nester, Federal Public Defender, and Bretta Pirie, Assistant Federal Public Defender, with her on the brief), Office of the Federal Public Defender, Salt Lake City, Utah, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BACHARACH**, and **McHUGH**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

Tommy Gurule was frisked during a routine traffic stop of a car in which he was a passenger. When officers discovered a pistol, he was arrested and charged under 18 U.S.C. § 922(g) as a felon in possession of a firearm. Gurule moved to suppress both the pistol and his subsequent confession as the products of an illegal search.

The district court granted this motion, concluding Gurule had been unlawfully detained during the traffic stop and the officers lacked the necessary reasonable suspicion to frisk him.

We reverse. We conclude the officers did not violate the Fourth Amendment when they (1) reasonably detained Gurule and the other occupants of the car prior to the search; and (2) frisked Gurule after they observed a gun in his pocket and had otherwise developed the reasonable suspicion he might be armed and dangerous.

## I. Background

On the night of June 29, 2017, an officer from the West Valley City street crimes unit observed a sedan commit several traffic infractions. The officer initiated a traffic stop, and the car pulled into the parking lot of a nearby gas station. The parking lot was poorly lit, with a fence to the vehicles' right, the station to their left, and a darkened field beyond.

The sedan contained three occupants—two in front and one in back. None possessed a valid driver's license, and the driver had accumulated multiple misdemeanor warrants, which she volunteered to the officer upon first contact. As the officer conducted a records check, one of his colleagues arrived to provide backup. Upon his arrival, the second officer made idle conversation with the occupants of the vehicle and focused primarily on securing the scene. The sedan was outfitted with tinted windows and also contained a great deal of property, since the driver apparently was living out of her car.

After completing a records check, the driver was informed that a licensed driver was required to operate the vehicle lawfully. The officer also told the driver he would not arrest her if she revealed the presence of any contraband in the sedan. In response, she volunteered that the officers could search her vehicle to verify her claim that it contained nothing illegal. The officer confirmed her consent to the search and asked that she contact a licensed driver.

The officers then asked the vehicle's passengers to exit. Upon leaving the car, the front-seat passenger consented to a protective frisk. The officers then asked the back-seat passenger—Tommy Gurule—if they could also perform a protective frisk. Gurule twice told the officers that he would not consent to a search, and was directed to sit at a nearby curb.

Gurule had initially engaged officers in a friendly manner—even volunteering that a bottle of alcohol in the sedan was his, so as not to incriminate

the driver. As one officer asked repeatedly whether Gurule possessed any weapons, both officers began expressing concern that he was responding deceptively. Gurule disputed that he was acting uncooperatively and stated that he had no weapon. Unsatisfied with this response, one of the officers ordered Gurule to stand.

As Gurule began to stand, the other officer noted a visible bulge in Gurule's right-front pocket. That officer took hold of Gurule's right arm as a protective action. He then observed a gun in Gurule's right-front pocket. Both officers handcuffed Gurule before confiscating a pistol. Gurule's equivocal response to questioning about his criminal history prompted further investigation, which revealed a prior felony conviction. He was arrested and—in a post-arrest interview—confessed to knowingly possessing the pistol.

Gurule subsequently filed a motion to suppress both the firearm and his post-arrest statements, arguing they were fruits of an unlawful detention and search. After an evidentiary hearing at which both officers testified, the district court concluded Gurule should have been free to leave the scene on foot before the protective search. The district court also found that—even had Gurule's detention been lawful—the officers had not developed the requisite reasonable suspicion to frisk him.

## II. Analysis

-4-

The government contends that (1) the officers were permitted to detain Gurule until completion of the traffic stop; and (2) the protective search was lawful since—during the detention—officers developed reasonable suspicion that Gurule was armed and dangerous.  We agree.

We accept the district court's factual findings "unless they are clearly erroneous."  *United States v. Burleson*, 657 F.3d 1040, 1044 (10th Cir. 2011) (quoting *United States v. Caro*, 248 F.3d 1240, 1243 (10th Cir. 2001)).[1]  But we review *de novo* the district court's legal conclusions, including "the ultimate determination of reasonableness under the Fourth Amendment."  *Id*. (same).

### A.  The Traffic-Stop Detention

Traffic stops are seizures subject to the Fourth Amendment's requirement for reasonableness.  *See, e.g.*, *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015).  It is well-established that the "touchstone" of this inquiry "is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."  *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (citing *Terry v. Ohio*, 392 U.S. 1, 19 (1968)) (internal quotation marks omitted).  "Reasonableness" in this context will hinge "on a balance between the public interest and the individual's right to personal security free from arbitrary

---

[1]  Video and audio body-camera footage from both officers was also included in the record.  R. 136, 137.

interference by law officers." *Id*. at 109. (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

In *Mimms*, the Supreme Court recognized "the safety of the officer" as a "legitimate and weighty" interest in support of detention during a traffic stop. *Id*. at 110. "Against this important interest," courts must weigh "the intrusion into the driver's personal liberty . . . by the order to get out of the car." *Id*. at 111. Ultimately, the Court concluded this intrusion was "at most a mere inconvenience [that] cannot prevail when balanced against legitimate concerns for the officer's safety." *Id*.

The Supreme Court has employed a similar logic in permitting police officers to order *passengers* from stopped cars. In *Maryland v. Wilson*, the Court—while acknowledging the personal-liberty interests of "passengers [are] in one sense stronger than that for the driver"—also recognized that the "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." 519 U.S. 408, 413–14, 14–15 (1997). For this reason, the Court concluded that "[t]he risk of harm to both the police and the [vehicle's] occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id*. at 414. (quoting *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981)).

For much the same reason, the Supreme Court has observed it is "reasonable for passengers to expect that a police officer at the scene of a crime,

arrest, or investigation will not let people move around in ways that could jeopardize his safety." *Brendlin v. California*, 551 U.S. 249, 258 (2007). Indeed, the Court explained that no "sensible person" would "expect a police officer to allow people to come and go freely from the physical focal point of an investigation." *Id*. at 257.

Moreover, the Court has further acknowledged that passengers may be detained *for the duration* of an otherwise-valid traffic stop: "The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene. . . ." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citing *Brendlin*, 551 U.S. at 258).

Employing much the same calculus in balancing these interests, our court has likewise held police officers may lawfully order passengers to remain in a stopped vehicle, *United States v. Holt*, 264 F.3d 1215, 1223 (10th Cir. 2001) (en banc), or to exit the vehicle, depending upon the circumstances. *United States v. Dennison*, 410 F.3d 1203, 1210–11 (10th Cir. 2005) ("[A]n officer making a traffic stop may order both the driver and passengers to exit the vehicle pending completion of the stop because the additional intrusion on the passenger is minimal." (citations and quotation marks omitted)).

Given the circumstances the officers confronted in this case, these principles point towards an inescapable conclusion. So long as law enforcement

retains the "need to control the scene"—here, for at least the duration of a consent search of the vehicle—the longstanding interest in officer safety outweighs any additional intrusion created by investigatory detention to a passenger's personal liberty. *See Johnson*, 555 U.S. at 333.[2]

Gurule argued before the district court the officers unreasonably extended his detention by requiring that he remain at the scene of the traffic stop beyond the point at which it was clear he had no warrants and was not dangerous. But, as we have discussed, our precedent establishes that a passenger may be detained for the duration of an otherwise-lawful traffic stop.

For the first time on appeal—relying upon *Rodriguez v. United States*, 135 S. Ct. 1609 (2015)—Gurule argues the officers also unconstitutionally extended the traffic stop *as against the vehicle's driver.* In *Rodriguez* the Supreme Court observed that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id*. at 1614 (citations omitted). Gurule contends the lead officer extended the permissible duration of the stop by questioning the driver about the contents of her car.

---

[2] In his answer brief, Gurule argues for the first time that the search of the vehicle was coerced. Aple. Br. 23–27. We decline to consider the merits of this claim, as Gurule presented as undisputed fact before the district court in his Memorandum in Support of Motion to Suppress that "the driver consented to a search of the vehicle." *See* R. 10.

Although not preserved below, if we did reach the merits, this argument likewise cannot support Gurule's theory that he was unlawfully detained as a derivative consequence of the driver's detention. None of the vehicle's occupants possessed a valid driver's license, and the efforts on the part of law enforcement to help locate a licensed driver cannot be characterized as unconstitutionally extending this traffic stop.

In a similar case, *United States v. Vargas*, 848 F.3d 971, 974 (11th Cir. 2017), an officer learned during the course of a valid traffic stop "that [the driver] did not have a driver's license, so [he] could not legally operate the vehicle. In an attempt to find someone who could, [the officer] asked [the passenger] if he had a driver's license." *Id*. at 974. The passenger, like Gurule here, did not have one either.

In *Vargas*, the officer "went even further in his attempt to end the detention and . . . asked [both driver and passenger] if they knew someone with a license they could call to drive the vehicle away." *Id*. In finding no fault with the encounter, the court held: "All of [law enforcement's] actions were taken in the lawful discharge of [its] duties, *which included enforcement of the law requiring that any person driving a vehicle be licensed to do so*." *Id*. (emphasis added).

Most importantly, that exercise was, "in the words of the *Rodriguez* opinion, *'fairly characterized as part of [law enforcement's] traffic mission.'*" *Id*. (emphasis added). It was "after [law enforcement] discovered that neither man

had a driver's license, *and while the continued detention was still lawful*, that [the] officer] asked [the driver] for permission to search the vehicle." *Id*. As the court observed, efforts aimed at preventing unlicensed drivers "from driving off without a license is lawful enforcement of the law, not unlawful detention." *Id*. "What prolonged the stop was not [law enforcement's] desire to search the vehicle but the fact that [the] occupants of it could not lawfully drive it away." *Id*. at 974–75.

The same logic would apply here. Accordingly, we conclude the district court erred in finding the officers unlawfully detained Gurule prior to the pat-down search.

### B. The Pat-Down Search

During a valid investigatory detention, officers may conduct a limited protective search (commonly called a pat-down search or frisk) if they develop an articulable and reasonable suspicion that the subject is armed and dangerous. *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018). Within the context of a traffic stop, this is true not only for the driver but also for any passengers. *Johnson*, 555 U.S. at 332.

Because a frisk is a search for the purposes of the Fourth Amendment, it is subject to the reasonableness requirement the Supreme Court outlined in *Terry*. *United States v. Garcia*, 751 F.3d 1139, 1142 (10th Cir. 2014). The primary justification for a frisk, of course, is officer safety. *Id*. (citing *Terry*, 392 U.S. at

27).  We accordingly recognize the officer-safety rationale can overcome even "limited specific information leading [law enforcement] to believe that an individual was armed or dangerous."  *Id*. (quoting *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996)).

At any rate, reasonable suspicion "is not, and is not meant to be, an onerous standard."  *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (quoting *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011)).  It requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause.  *Id*. (quoting *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013)).  So long as officers develop "a particularized and objective basis for suspecting an individual may be involved in criminal activity, [they] may initiate an investigatory detention *even if it is more likely than not that the individual is not involved in any illegality*."  *Id*. at 1379–80.  (citing *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)) (emphasis added).

When assessing reasonable suspicion, we "defer to all reasonable inferences made by law enforcement officers in light of their knowledge and professional experience distinguishing between innocent and suspicious actions."  *Id*. at 1379.  (citing *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009)).  We evaluate each factor alleged to support an inference of reasonable suspicion separately and in the aggregate.  *Id*. at 1380.  (citing *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998)).  Although individual

-11-

factors—when analyzed separately—might admit of innocent explanation, we may nonetheless hold they create reasonable suspicion in the aggregate. *See id*.

### 1. Timing of the Frisk

The parties contest the precise moment at which the search commenced. Gurule contends the search began when he was ordered to his feet and one officer grabbed hold of his right arm. The government, by contrast, argues the search did not commence until the officer physically manipulated Gurule's right-front pocket—at which point one officer had already observed not only the bulge *but also the gun itself*.

The government has the stronger argument. The frisk did not begin until after Gurule was already on his feet and officers had seen the gun. We evaluate the circumstance under an objective standard, and even if the officers intended to frisk Gurule after he was on his feet, that does not matter for our analysis. *See United States v. Tinnie*, 629 F.3d 749, 753 (7th Cir. 2011) (observing "it is irrelevant that" the officer "decided to frisk" the defendant "before directing him to exit the car"). Thus, by the time the search had therefore begun, at least one officer had seen the gun, such that both officers were justified in securing it for the duration of the vehicle search. *Garcia*, 751 F.3d at 1141.

But even had we accepted Gurule's argument that the frisk began when he was ordered to his feet, the totality of the circumstances created more than the requisite reasonable suspicion for officers to conduct the protective frisk.

## 2. *Reasonableness of the Frisk*

Several factors support a finding of reasonableness. As previously noted, the officers did not frisk Gurule until after they had noticed an unusual bulge in Gurule's right-front pocket. As the Supreme Court observed in *Mimms,* a visible and suspicious "bulge" in a driver's pocket may alone "permit[] the officer to conclude that [the suspect] was armed and thus posed a serious and present danger to the safety of the officer." 434 U.S. at 112.

Gurule contends the district court made no factual finding that either officer noticed the bulge. But this claim ignores both uncontested testimony about what officers observed, as well as footage from both body cameras indicating a plainly-visible bulge. *E.g.*, R. 116-18. Moreover, the very fact that the officers asked repeatedly whether Gurule was carrying a weapon suggests contemporaneous concern that he was deceitful.[3]

The government also emphasizes the vulnerability that attends the act of turning one's back on multiple subjects while searching an unfamiliar vehicle. The very fact of a search creates a need to detain individuals safely. *See, e.g.*,

---

[3] The district court also relied on an unpublished case, *United States v. House*, 463 F. App'x 783 (10th Cir. 1999), for the proposition that even *actual* knowledge that a suspect was armed would not create reasonable suspicion that he might be "armed *and dangerous*." *See* R. 69. (emphases added). But we have explicitly rejected the notion that officers must assess "armed" and "dangerous" in disjunctive fashion: "[A]n officer's suspicion that an individual is dangerous can affect that officer's suspicion that an individual is armed, and vice versa." *Garcia,* 751 F.3d at 1143 n.7.

*United States v. Manjarrez*, 348 F.3d 881, 886–87 (10th Cir. 2003) ("The purpose of the limited pat-down search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence.") (citations and quotation marks omitted).  Nor does the presence of an additional officer necessarily vitiate this concern.  *See United States v. Fager*, 811 F.3d 381, 389 (10th Cir. 2016) ("[I]f [the defendant] harbored a desire to use his weapon against the officers, he may very well have used it regardless of whether the backup officer was keeping an eye on him. . . .").

This danger is only heightened when at least one of the subjects has accumulated multiple arrest warrants.  Officers are "entitled to infer a common purpose or enterprise" between drivers and passengers when one, as here, knows of the other's "arrest warrants and would want to conceal evidence of any wrongdoing."  *See id*. (quoting *Dennison*, 410 F.3d at 1213).[4]

In this instance, the driver volunteered she was the subject of at least one outstanding warrant for theft.  And the district court found—based on the

---

[4] We have observed that—"[i]n conjunction with other factors[—]criminal history *contributes powerfully to the reasonable suspicion calculus*."  *E.g., United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010) (quoting *United States v. White*, 584 F.3d 935, 951 (10th Cir. 2009)).  But this commonsense principle is not without limits and must operate—as here—in conjunction with other factors: "To be sure, this [c]ourt has held that a prior criminal history is by itself insufficient to create reasonable suspicion."  *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) (citing *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994)).

testimony of one officer—that the vehicle's backseat contained a great deal of property.  R. 63.  The combination of these circumstances could reasonably lead officers to conclude they should exercise special caution in conducting the search, given the possibility that criminal activity was once again afoot.

The time and the place of the traffic stop lastly contribute to the reasonableness of the pat-down search.  In *Johnson*, we observed that "the nature of the area in which a detention takes place is a relevant consideration in the [reasonable-suspicion] analysis."  364 F.3d at 1193.  The stop transpired at night, (10:30 PM), and the government emphasizes both the darkness of the gas-station parking lot, as well as the proximity of a darkened field just beyond where the vehicles had stopped.  In addition, one officer observed that the general area "regularly sees a high volume of drug activity as well as property crimes[,] including stolen vehicles."  R. 108–09.

Even had one officer not seen the gun in Gurule's right-front pocket, we conclude these circumstances—when taken together—would create the requisite reasonable suspicion to justify the frisk.

## III.  Conclusion

For the reasons set forth above, we REVERSE the district court's decision granting Gurule's motion to suppress.

*United States v. Gurule*, No. 18-4039, Bacharach, J., concurring.

The majority opinion properly recognizes that Mr. Gurule forfeited his *Rodriguez* argument. Majority Op. at 9. Nonetheless, the majority states how it would decide this issue if it had been preserved. *Id.* at 9–10. Given Mr. Gurule's forfeiture, I would decline to say how we would decide the merits. I otherwise agree with the majority opinion.