FILED
United States Court of Appeals
Tenth Circuit

May 27, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ANTONIO ESQUIVEL-RIOS,

    Defendant - Appellant.

No. 14-3162

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 5:10-CR-40060-JAR-1)**

---

Michael M. Jackson, Topeka, Kansas, for Defendant - Appellant.

James A. Brown, Assistant United States Attorney (and Barry R. Grissom, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff - Appellee.

---

Before **BRISCOE**, Chief Circuit Judge, **SEYMOUR**, and **KELLY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

Defendant-Appellant Antonio Esquivel-Rios appeals from the district court's order denying his motion to suppress evidence. In Mr. Esquivel-Rios's first direct appeal, we concluded that the record lacked the quantity and quality of

information necessary for us to determine whether Mr. Esquivel-Rios's Fourth Amendment rights had been violated. United States v. Esquivel-Rios, 725 F.3d 1231, 1236–39 (10th Cir. 2013). We remanded to allow the district court to reconsider its Fourth Amendment ruling in light of our discussion. With the benefit of additional evidence and briefing, the district court concluded that Mr. Esquivel-Rios's Fourth Amendment rights had indeed been violated but that suppression was not appropriate given the lack of police culpability. United States v. Esquivel-Rios, 39 F. Supp. 3d 1175 (D. Kan. 2014). Accordingly, the district court denied Mr. Esquivel-Rios's motion to suppress for a second time. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

Background

We presented the facts giving rise to this criminal prosecution in the prior appeal:

> Our case began when Kansas Trooper Andrew Dean, a regular before this court, sat watching traffic along I-70. At some point, a minivan caught his eye. There was nothing special about the minivan except maybe the fact it bore a Colorado temporary 30-day registration tag. But even that didn't suggest anything amiss: the tag looked genuine enough, it was displayed in the right place, its expiration date hadn't yet passed. All the same, Trooper Dean decided to verify the tag with a law enforcement database. He called in the tag number to a dispatcher who soon replied "that's a negatory on record, not returning." Because of—and only because of—the dispatcher's "no return" report, Trooper Dean turned on his lights and stopped the minivan. After a brief discussion, the trooper sought and received permission to conduct a search, one that eventually yielded a secret

- 2 -

compartment containing over a pound of methamphetamine. Esquivel-Rios, 725 F.3d at 1234–35.

During the initial proceedings before the district court, Mr. Esquivel-Rios sought to suppress all evidence obtained as a result of the vehicle search. He argued that the traffic stop violated his Fourth Amendment rights because the trooper lacked reasonable suspicion of any criminal wrongdoing. Because the trooper stopped him solely because of the database's "no return" report, Mr. Esquivel-Rios argued, he lacked particularized and objective information to establish reasonable suspicion.

The district court disagreed, however, and denied Mr. Esquivel-Rios's motion to suppress. It concluded that the dispatcher's report, which indicated that no information could be obtained regarding the vehicle's registration, gave the trooper reason to suspect criminal activity. Later, Mr. Esquivel-Rios was found guilty of possessing methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1). Asserting various grounds for relief, Mr. Esquivel-Rios challenged his conviction in this court.

Much of this court's first opinion was devoted to a single issue raised by Mr. Esquivel-Rios on appeal: the interplay between database reliability and the existence of reasonable suspicion. We began by noting that the district court's reasonable suspicion determination was supported, at least superficially, by our Fourth Amendment cases. "This court and others have regularly upheld traffic

- 3 -

stops based on information that the defendant's vehicle's registration failed to appear in a law enforcement database . . . ." Esquivel-Rios, 725 F.3d at 1235 (citing United States v. Cortez-Galaviz, 495 F.3d 1203, 1205–06 (10th Cir. 2007); United States v. Garcia-Ballesteros, 74 F.3d 1250, 1996 WL 3920, at *1 (10th Cir. 1996) (unpublished table decision)). The logic of those traffic stop cases is quite simple. Most, if not all, states have laws requiring motor vehicle owners and operators to register their vehicles with a state agency before operating those vehicles on public roads. The state agency then maintains the registration information in a database, which is often accessible to law enforcement. Thus, "[w]hen a law enforcement database yields no information about a registration tag, . . . that raises a non-trivial possibility the tag wasn't lawfully issued in the first place but falsified in some way." Id. That non-trivial possibility, we have held, can amount to reasonable suspicion.

We also concluded in the first appeal that those cases were not dispositive of Mr. Esquivel-Rios's Fourth Amendment challenge. The presence of an additional, complicating fact that we had not before contemplated made Mr. Esquivel-Rios's case worthy of deeper consideration. See id. ("This court and others have regularly upheld traffic stops based on information that the defendant's vehicle's registration failed to appear in a law enforcement database—at least when the record suggested no reason to worry about the database's reliability.") (emphasis added). Here, there was evidence "suggesting

- 4 -

that the database on which the officer relied to justify his stop might bear a real problem—a problem that might mean a 'no return' <u>doesn't</u> suggest criminal conduct but only some bureaucratic snafu." <u>Id.</u> After dispatcher Derek Lathan informed the trooper that the temporary tag at issue was "negatory on the record, not returning," the trooper acknowledged the report, but then sought clarification. He asked, "Was that not on file or just no return?" Lathan responded, "Colorado temp tags usually don't return." 4 R. 3. This string of communications, including Lathan's critical statement that Colorado temporary tags "usually don't return," transpired before the stop was initiated.

We had previously left open the possibility that a demonstration of database unreliability "might well form a persuasive basis for a suppression motion," <u>Cortez-Galaviz</u>, 495 F.3d at 1209, and thus found significant that the record here might support such a demonstration. We concluded that the district court's decision to deny Mr. Esquivel-Rios's motion for suppression was problematic in light of this evidence, primarily for two reasons.

Our primary concern was that the record did not provide much information about the database on which the trooper relied. Instead, we knew only that the "no return" report served as the sole justification for the traffic stop. Without more information bearing on the database's reliability, we said it would be difficult (if not impossible) to determine whether this single report could constitute particularized evidence of criminal activity. <u>Esquivel-Rios</u>, 725 F.3d at

1236.  Most important, we emphasized how the reliability question informs the overall reasonable suspicion analysis.  Using a hypothetical example to demonstrate this point, we imagined a circumstance where a "no return" report was more likely to indicate innocuous behavior than criminal activity—for example, where "officials systematically decline to place information about Colorado temporary tags into the database because of their fleeting 30-day life span."  Id.  Under those circumstances, we expressed doubt that a "no return" report, without more, could support a finding of reasonable suspicion.  We stated:

> So if legitimate Colorado temporary tags are almost never placed in the database and if forged temporary tags account for an even smaller percentage of the population of temporary tags—both plausible possibilities—getting a "no return" result may tell a reasonable officer next to nothing: virtually every query would yield the same "no return" message whether the tag is legitimate or not.  And it is hard to imagine how a "no return" report in those circumstances could form a "particularized" basis to suspect wrongdoing.  What goes into the database will much affect the reasonableness of a search relying on it: garbage in, garbage out.

Id. at 1237.

We further expressed concern that the district court "failed to engage with evidence seeming to call the database into question."  Id. at 1238.  In our view, the district court erred by "treat[ing] this case as just another one where the database wasn't challenged."  Id. at 1237.  We noted that the district court's orders denying Mr. Esquivel-Rios's motions to suppress and for a new trial seemingly overlooked the significance of Lathan's comment that Colorado

- 6 -

temporary tags "usually don't return."  In addition, we noted that the district court's conclusion rested, at least in part, on misconstrued aspects of the trooper's testimony.  Id. at 1238.

There were simply too many unanswered questions and too many record ambiguities concerning the database reliability issue for the district court to conclude that no Fourth Amendment violation had occurred.  We therefore remanded for further proceedings.  In the interests of judicial economy, we recommended that the district court consider not only the Fourth Amendment question but also the question of remedy.  Id. at 1239.

On remand, the district court conducted an evidentiary hearing, where it heard testimony from Trooper Dean, dispatcher Lathan, Colorado Bureau of Investigation (CBI) employee Sydney Profancik, and Colorado Department of Motor Vehicles (CDMV) investigator James Kautz.  In addition, the court received documentary evidence in the form of written responses from both CBI and the Colorado Department of Revenue (CDOR or Department of Revenue).  Esquivel-Rios, 39 F. Supp. 3d at 1179.  The following was established through the testimony and exhibits adduced at the evidentiary hearing.

At the time Mr. Esquivel-Rios was pulled over in 2010, Colorado temporary tag information was not available in the Colorado Crime Information Center (CCIC), the database designated to interface with state and federal law enforcement agencies.  At that time, all Colorado temporary tag information was

maintained by the Department of Revenue. The CCIC database, however, was not maintained by either CDOR or CDMV; rather, it was maintained by CBI, and CBI did not receive temporary tag information from CDOR in 2010. 3 R. 539–40, 559. Thus, due to this lack of information-sharing, a CCIC query for Colorado temporary tag information in 2010 would have been futile. Id. at 540, 564. The only way to obtain this information, witnesses testified, was by placing a phone call or sending an administrative message to CDOR. Id. at 540, 561. It was only in 2012, long after Mr. Esquivel-Rios had been arrested and charged, did this practice change. By the spring or early summer of 2012, the CCIC database was loaded with temporary tag information provided by CDOR, id. at 559; see id. at 540; even then, the temporary tag information loaded into the database pertained only to tags issued in December 2011 or later. 4 R. 7–8.

The testimony at the evidentiary hearing established that a CCIC query for a vehicle's registration information can yield one of three results: (1) the requested information is produced; (2) no record / not on file; or (3) an error report resulting from "invalid information." Id. at 545. A database query in 2010 for a Colorado temporary tag would have yielded the second possibility, "not on file," which indicated that the relevant information "has not been put into the system yet, or . . . there is no record available for that tag." Id. at 546. "No return," which was Lathan's report to the trooper, is not one of the possible results. Id. at 547, 566. Notably, the database provides no warning or

notification to end-users that it does not contain the requested information—it simply provides a "not on file" response.  Id. at 540–41, 552.

After the trooper radioed in his request to dispatch, Lathan queried his computer system for the vehicle's registration and VIN.  His system reported, as to both the registration and the VIN, that the information was "not on file" based on a "response from DMV."  4 R. 52–53.  With these results, Lathan reported back to the trooper that the information was "negatory on the record, not returning."  Although Lathan reported to the trooper that the information was not returning, both Lathan and the trooper testified that "not on file" and "not returning" were functional equivalents—neither would allow an officer to verify a vehicle's registration status.  3 R. 573, 597–98, 601.

Lathan and the trooper testified that they had never been specifically advised, through training or otherwise, that Colorado's database lacked registration information for temporary tags.  Id. at 570, 584, 601, 608.  In general, this is something law enforcement personnel would have learned only through experience.  Id. at 561–62.  In Lathan's experience, electronic queries for Colorado temporary tags were unsuccessful; thus, he testified that, when he ran this particular query, he suspected it would not produce the requested information.  Id. at 571–72.  The trooper testified, however, that at the time he conducted the stop, he did not believe the database was unreliable.  Id. at 602, 608, 617.  While he recalled a number of occasions where information pertaining

to temporary tags was not available, he did not believe such information was categorically unavailable. Id. at 601–02, 608, 621. To the contrary, the trooper testified that he thought registration information for Colorado temporary tags had previously been available upon request. Id. at 602.

According to the trooper's testimony, it is part of his agency's mission to determine whether vehicles traveling on Kansas roads were validly registered, which, in turn, requires him to investigate potential automobile thefts and forged or altered registrations. Id. at 599–601. He testified that Lathan's report raised his suspicions in light of his investigatory experience, and that he believed he could only determine whether the vehicle was validly registered by conducting a traffic stop. Id. at 599. This was something the trooper had done on numerous prior occasions. Id. at 602–03.

Because the CCIC database did not contain any Colorado temporary tag information in 2010, the database's report told "a reasonable officer next to nothing" about the legality of the vehicle's operation. Esquivel-Rios, 725 F.3d at 1237. Thus, hewing closely to this court's guidance from the first direct appeal, the district court found that it had "no choice but to conclude that the 'negatory on record, not returning' report . . . did not qualify as particularized evidence that the vehicle was not properly registered." Esquivel-Rios, 39 F. Supp. 3d at 1185. The district court therefore found that the trooper's traffic stop violated the Fourth Amendment. Despite the constitutional violation, however, the district

court found that no basis existed to apply the exclusionary rule.  In the court's

view, "the evidence show[ed] that Trooper Dean reasonably, but mistakenly

believed that the report from dispatch indicated that criminal activity might be

afoot, and that he had reasonable suspicion to stop Defendant's vehicle."  Id. at

1188.  Additionally, the court found no evidence to support Mr. Esquivel-Rios's

argument that CBI's maintenance of the CCIC database amounted to "systemic

negligence," warranting exclusion.  Finding no police culpability or systemic

negligence to deter, the district court concluded that "the benefits of deterrence in

this case do not outweigh its heavy cost."  Id. at 1189.


Discussion

On appeal, the government has abandoned any argument that the "no

return" report constituted particularized and objective evidence sufficient to

support a finding of reasonable suspicion.  Instead, the government contends that

the trooper's reasonable but mistaken beliefs were constitutionally sufficient to

furnish grounds for an investigatory detention.[1]  Aplee. Br. 22–23, 31.  In the

_____

[1] We note that the government's position on appeal varies somewhat from what it argued in the district court.  After the remand hearing, the government argued that reasonable suspicion existed because CDOR maintained a database of temporary tags and therefore the "not on file" response raised reasonable suspicion of criminal activity.  1 R. 285.  This theory was rejected by the district court.  Esquivel-Rios, 39 F. Supp. 3d at 1184–85.

As part of its good faith argument, however, the government contended that Trooper Dean could have reasonably, but mistakenly, believed that the "not on file" response furnished reasonable suspicion.  1 R. 287–88 (citing United States

- 11 -

alternative, the government contends that even if a Fourth Amendment violation did occur, the exclusionary rule should not apply because there is no police misconduct to deter. It contends that the deterrence rationale is further undercut in this case because any alleged systemic negligence has been remedied—the Colorado database now contains registration information for temporary tags. We agree that exclusion is not an appropriate remedy and, therefore, decline to address the government's "reasonable but mistaken" belief argument.

A.     The Exclusionary Rule and the Good Faith Exception

The exclusionary rule bars the prosecution from using, in its case-in-chief, evidence obtained in violation of the Fourth Amendment. Herring v. United States, 555 U.S. 135, 139 (2009). Whether the rule applies in any given case, however, is context-dependent. In other words, "suppression is not an automatic consequence of a Fourth Amendment violation." Id. at 137; Hudson v. Michigan, 547 U.S. 586, 591 (2006).

---

v. Shareef, 100 F.3d 1491, 1505 (10th Cir. 1996)). The district court adopted part of this argument in portions of its remedy discussion, noting the trooper's lack of culpability. Esquivel-Rios, 39 F. Supp. 3d at 1186. Now, the government has advanced the "reasonable but mistaken belief" argument in support of the threshold question—whether the Fourth Amendment was violated in the first instance—rather than in support of the remedial question.

Of course, application of the exclusionary rule is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." Arizona v. Evans, 514 U.S. 1, 10 (1995) (citations omitted). We question whether the government adequately preserved its argument that a reasonable but mistaken belief furnishes reasonable suspicion in this case.

Our analysis is guided by several well-established principles.  First, the primary object of the exclusionary rule is deterring future Fourth Amendment violations.  Evans, 514 U.S. at 10; United States v. Leon, 468 U.S. 897, 908–10 (1984).  The Court has stated that suppression is justified only if it will result in "appreciable deterrence."  United States v. Janis, 428 U.S. 433, 454 (1976).

Second, "if exclusion of evidence . . . is to have any deterrent effect . . . it must alter the behavior of individual law enforcement officers or the policies of their departments."  Leon, 468 U.S. at 918.  Thus, determining whether exclusion will further the deterrence rationale requires an assessment of the police misconduct.  Id. at 911; see also Evans, 514 U.S. at 14–16.  Traditionally, exclusion was reserved for willful violations of Fourth Amendment rights.  Leon, 468 U.S. at 919 ("If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence . . . should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.") (quoting United States v. Peltier, 422 U.S. 531, 542 (1975)).  In Leon, the Court held that the exclusionary rule does not apply in cases where "the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment."  Id. at 918.  Adopting the so-called "good faith exception" to the exclusionary rule, the Court found that exclusion "cannot be expected, and should not be applied, to deter objectively reasonable law

enforcement activity." Id. at 919. Recent "good faith" cases have reiterated that exclusion is proper only where the conduct at issue is both sufficiently deliberate and culpable. Herring, 555 U.S. at 144; Evans, 514 U.S. at 13–15. As the Herring Court summarized, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." 555 U.S. at 144.

Third, courts must balance the benefits of deterrence against the costs of excluding reliable evidence. Id. at 141; Leon, 468 U.S. at 906–07. "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the substantial social costs exacted by the exclusionary rule." Illinois v. Krull, 480 U.S. 340, 352–53 (1987) (internal quotations omitted). The Court has described the appropriate balance, stating that the "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring, 555 U.S. at 144.

Finally, and related to the second principle discussed above, the Court has imposed an important limit on law enforcement's ability to invoke the good faith exception. Leon made clear that the "benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" are "marginal or nonexistent," and are therefore outweighed by the costs of exclusion. 468 U.S. at 922. But in other cases, where law enforcement's

reliance is not "objectively reasonable," exclusion remains an appropriate remedy. Id. at 922–23. A number of recent Supreme Court cases have discussed this "objectively reasonable" requirement in the context of police officers relying on law enforcement databases.

In both Herring and Evans, defendants were detained after electronic warrant databases reported to law enforcement that there were outstanding warrants for their arrest. Herring, 555 U.S. at 137; Evans, 514 U.S. at 4. In both cases, however, the databases provided outdated information; Herring's warrant had been recalled, 555 U.S. at 138, and Evans' warrant had been quashed, 514 U.S. at 4. Notwithstanding the constitutional violations, the Supreme Court declined to suppress the evidence, finding that the officers' reliance on the warrant databases was objectively reasonable. In a concurring opinion in Evans, Justice O'Connor cautioned that blind reliance on (potentially unreliable) law enforcement databases might be unreasonable, precluding claims of good faith. "Surely it would not be reasonable for the police to rely, say, on a recordkeeping system, their own or some other agency's, that has no mechanism to ensure its accuracy over time and that routinely leads to false arrests." 514 U.S. at 17 (O'Connor, J., concurring). Later, in Herring, Justice Ginsburg's dissenting opinion echoed similar concerns, arguing that application of the exclusionary rule incentivizes law enforcement agencies to maintain their databases with utmost diligence. 555 U.S. at 153–57 (Ginsburg, J., dissenting). Responding to those

concerns, the Herring majority conceded that, in a different case, if "systemic errors [in maintaining a database] were demonstrated, it might be reckless for officers to rely on an unreliable warrant system." Id. at 146. Thus, "[i]f the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation." Id.

B.    Analysis

With these principles guiding our analysis, we turn to the case at bar. We review the district court's decision to apply the good faith exception to the exclusionary rule de novo. United States v. Johnson, 408 F.3d 1313, 1320 (10th Cir. 2005). Resolution of this case turns on our answers to two important questions. We note at the outset that, for purposes of this dual inquiry, we are assuming, but not deciding, that there was a constitutional violation. Cf. Herring, 555 U.S. at 139. With that assumption in hand, we first ask whether the trooper's conduct was deliberate, reckless, or grossly negligent, such that similar conduct could and should be deterred through exclusion. Second, we ask whether any such constitutional violation was the product of recurring or systemic negligence. On the facts of this case, we answer both of these questions in the negative.

We turn first to an assessment of the trooper's individual conduct. In Mr. Esquivel-Rios's view, the district court erroneously concluded "a reasonable

officer in Dean's position could reasonably assume that Colorado maintained a record of temporary tags in a database available to law enforcement." Aplt. Br. 27 (quoting Esquivel-Rios, 39 F. Supp. 3d at 1188). He contends that, given both the trooper's previous experience with temporary tags and Lathan's statement, it constituted gross negligence to rely on a "no return" report as the foundation for a reasonable suspicion determination. We disagree that the trooper's conduct rises to a level of culpability warranting exclusion.

In our view, Lathan's statement is the only complicating factor in an otherwise straight-forward case. Absent that statement, the record reflects only a Kansas State Trooper with no first-hand knowledge of how the relevant Colorado database works, who believes the database is reliable, and who mistakenly recalls obtaining registration information for Colorado temporary tags in the past. As the district court noted, there was no evidence to suggest the trooper intentionally remained unaware of how Colorado maintained registration information for temporary tags, and he had received no training about the type of information that is or is not entered into the Colorado database. Morever, we note that, at the time of the stop, at least one Tenth Circuit case had found reasonable suspicion based on similar reports. See, e.g., Cortez-Galaviz, 495 F.3d 1203; Garcia-Ballesteros, 74 F.3d 1250; cf. Davis v. United States, 131 S. Ct. 2419 (2011).

The fact of Lathan's statement, however, complicates matters somewhat. We are left to consider whether the content and nature of that statement renders

the trooper's reliance on the database objectively unreasonable. For several reasons we decline to hold that this statement, standing alone, renders that reliance objectively unreasonable. For starters, we agree with the district court that Lathan's comment was both equivocal and anecdotal. Reporting that certain information "usually" does not return is much different than stating certain information is categorically unavailable. For that matter, Lathan did not know why temporary tag information "usually" did not return. In fact, the results Lathan received contained some indicia of reliability—they were "response[s] from DMV." 4 R. 52–53.

All that aside, we simply cannot conclude that the trooper's conduct was "sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring, 555 U.S. at 144. "We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." Id. at 141 (citation omitted). Here, Lathan's statement, made in response to Trooper Dean's request for clarification, would not have put a reasonable officer on notice that the entire database was unreliable. Without such notice, there is no misconduct to deter; there is only objectively reasonable law enforcement activity. It might be a different case if we were considering a Colorado law enforcement officer's reliance on a CCIC database report; record evidence suggests that Colorado law enforcement personnel were aware that the CCIC database did not contain temporary tag registration information. But such

- 18 -

facts are not before us.

Turning to the issue of recurring or systemic negligence, Mr. Esquivel-Rios urges this court to focus on the conduct of CBI, as operators of the database that led to the assumed constitutional violation. He argues that CBI knowingly "laid the groundwork for future false arrests," Aplt. Br. 18, and did so in violation of both Colorado law and a Federal Bureau of Investigation mandate, id. at 19.

We reject the argument that any Fourth Amendment violation was the result of recurring or systemic negligence on behalf of CBI. Mindful of the Supreme Court's caution concerning databases rife with systemic errors, we read those cautionary statements as admonishments to law enforcement to avoid boot-strapping. But even if those statements could be or should be interpreted more broadly, they cannot fairly be interpreted to mean that every law enforcement agency using something less than an all-encompassing database is systemically negligent. Of course, the creation and maintenance of comprehensive law enforcement databases implicates policy decisions, including decisions about resource and personnel allocation, as well as interagency information-sharing. While we would not sanction a law enforcement regime that routinely leads to false arrests due to grossly mismanaged databases, we decline to find gross mismanagement where one agency (CDOR) has the information that another agency (CBI) needs to maintain a complete database. As the district court correctly noted, there is no evidence that CBI negligently failed to update its

database or routinely made record-keeping errors—it simply did not have the information it needed.

We also find unpersuasive Mr. Esquivel-Rios' argument that CBI's operation of the CCIC database ran afoul of an FBI mandate and Colorado statute. First, he provides no support for his argument concerning a federal mandate. Second, the Colorado statute he relies on, Colo. Rev. Stat. § 24-33.5-412(1)(c.5), permits but does not require CBI to "maintain a computerized data file of motor vehicle information." Further, that provision refers to "motor vehicle information received from the department of revenue." Id. (emphasis added). It is undisputed here that CBI did not receive from CDOR information pertaining to temporary tags until 2012. Finally, Mr. Esquivel-Rio's assertion that CBI "instructed" the database to provide "not on file" responses in order to lay the groundwork for future false arrests is entirely speculative.

Here, a law enforcement officer of one state relied on the law enforcement database of another state. The record does not support a finding that his reliance was reckless, grossly negligent, or otherwise objectively unreasonable. It also does not support a finding that the Colorado Bureau of Investigation, by failing to obtain and report temporary tag information in its database in 2010, negligently maintained a database it knew was leading to unconstitutional detentions. Accordingly, exclusion is not warranted.

The judgment of the district court is AFFIRMED.